# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-KA-00221-SCT

*JENNIFER WEATHERSPOON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/15/2008 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: ERIN ELIZABETH PRIDGEN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/20/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., LAMAR AND CHANDLER, JJ.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT**

¶1.     After a trial in the Circuit Court for the Second Judicial District of Bolivar County, the jury convicted Jennifer Weatherspoon of aggravated assault and murder. Weatherspoon was sentenced to serve consecutive sentences of twenty years for the aggravated-assault conviction and life imprisonment for the murder conviction. In today's appeal, Weatherspoon complains only as to the murder conviction, arguing that the trial court abused its discretion when it failed to grant her a new trial. Addressing the propriety of the verdict

of guilty on the murder count, we find the verdict was not against the overwhelming weight of the evidence. Thus, we affirm the final judgment of conviction and sentence entered by the Circuit Court for the Second Judicial District of Bolivar County.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. This case involves a fatal shooting at the Hurricane Club in Cleveland, where a brawl ensued between two adult males in the club's dimly lit parking lot, followed by gunfire and club-goers fleeing into the Delta night. The Cleveland Police Department began an investigation, and, throughout the next year, witnesses made statements and admissions concerning that night. This appeal concerns the shooting death of Derrick McKinney ("Rell" or "Rail"). Weatherspoon does not attack her conviction for the aggravated assault of Seagram Bacardi Foster.[1]

¶3. The uncontradicted facts are as follows. On September 23, 2005, Jennifer Weatherspoon and Damien Johnson, girlfriend and boyfriend, were at the Hurricane Club.

---

[1]In her notice of appeal, Weathespoon states that she is appealing "from her conviction for murder and aggravated assault and sentence of life and twenty years," but her brief is devoted solely to a discussion of her murder conviction. In fact, in her brief, Weatherspoon states that she had voluntarily spoken to law enforcement officials, admitting that she was involved in the shooting, and that "[s]he even told Foster's mom, Jessie Robinson, that she was the person that shot Foster." Additionally, the State, in its brief, asserted that Weatherspoon's "conviction of aggravated assault is not contested," and Weatherspoon filed no reply brief disputing the State's assertion. Finally, we note that there exists a longstanding principle of law that if an appellant makes an allegation of error without supporting such allegation with argument or authority, "this Court need not consider the issue." *Jordan v. State*, 995 So. 2d 94, 104 (Miss. 2008) (citing *Pierre v. State*, 607 So. 2d 43, 48 (Miss. 1992)). Since Weatherspoon makes no argument and cites no authority concerning her aggravated-assault conviction, we will focus our discussion on Weatherspoon's murder conviction.

2

Weatherspoon began to flirt with both Carlos White ("Primos") and McKinney. Johnson entered the club, cursed, and tightly wrapped his hand around Weatherspoon's neck. Hoping to avoid a potential fight, McKinney left the club, walked through the parking lot, and stopped near the street in the front of the club. Johnson and White also exited but quickly began to argue. White told Johnson that Weatherspoon had flirted with White, causing Johnson to punch White in the face.

¶4.     Viewing the altercation from his nearby car, Foster, White's brother, ran to assist White. Before Foster could throw a punch, Weatherspoon shot him in the back. Other shots followed. McKinney proceeded to stop the fight. After the shots, McKinney immediately ran from the fight and collapsed in an adjacent field.

¶5.     White testified that during the melee, Weatherspoon had pulled a gun from her purse and started shooting. He heard shots coming from Weatherspoon's weapon. He also testified that Weatherspoon was the sole shooter that night. On cross-examination, defense counsel impeached White based on an earlier statement in which White had told the police that he had not seen Weatherspoon with a gun.[2] White further testified that he had heard two shots while in the front of the club and then four or five shots – fired rapidly – when he was on the side of the club.

---

[2] White's written statement to police was marked as an exhibit for identification purposes only and was not introduced into evidence. Several witnesses were impeached by their previous statements to the police. This is of little consequence on appeal. *See **Byrd v. State***, 522 So. 2d 756, 760 (Miss. 1988) ("The jury is the sole judge of the weight and credibility of the evidence.").

¶6. Seagram Bacardi Foster testified that Johnson hit White, prompting Foster to run to the fight. Running to the altercation, Foster passed Weatherspoon, standing near the fight, who reportedly stated, "You running that way, you need to watch me." As Foster approached Johnson and his brother, Foster was shot in the back. Foster testified at trial that he thought Weatherspoon was the shooter based on her position in relation to the shots fired. After hearing the shots, Foster ran with White to the rear of the club, where White informed Foster that Foster had been shot. Specifically, White informed, "Yeah, she shot you." Before the altercation, Foster had noticed McKinney across the street. Foster did not see Weatherspoon shoot McKinney. Foster testified that after he had been shot, he had run behind the club and had heard four or five more shots. Foster had then gone to his truck, grabbed his Tech-9, and before collapsing, had asked who had shot him. In his interview with police, he denied having a firearm.

¶7. Jessie Robinson, the mother of White and Foster, testified that in November 2005, Weatherspoon had told Robinson that "she didn't shoot Rell [McKinney] but she shot Bacardi [Foster]."

¶8. Romayel Patton testified that he and Reginald Brown, his cousin, had been sitting in Brown's car in the club's parking lot when White and Johnson began to fight. Patton had seen Weatherspoon fire several shots toward the altercation. Weatherspoon was two or three feet from the front of Brown's car, and Patton could see fire coming from Weatherspoon's weapon. According to Patton, all five or six shots had come very quickly. After the shooting had started, Patton had watched McKinney run beside Patton's vehicle and away from the

4

fight. Patton described McKinney's posture as "[i]n a leaned over position." Patton had seen no one else with a gun.

¶9. Reginald Brown testified that he had also seen Weatherspoon with a gun in her hand and with fire coming from the barrel. Brown had heard Weatherspoon say, "Why y'all paying attention to him? You need to be paying attention to me." Brown had heard two shots and then five more. Brown had seen McKinney run by the car after the shooting had begun. Brown had seen no one else with a gun.

¶10. Rodya Nicks rode with McKinney to the club. She testified that when the argument started, she and McKinney had been standing near her car. According to Nicks, McKinney had decided to stop the fight and had run toward it. Nicks had witnessed Weatherspoon pull a gun from her purse and begin shooting. After the shooting had begun, McKinney had run from the fight and back through the parking lot, yelling "she shot me," and had collapsed in a lawn adjacent to Nicks's car. Nicks had heard at least three shots. She had seen no other shooters.

¶11. George Serio, an investigator with the Cleveland Police Department, visited the Hurricane Club, where his investigation revealed that Weatherspoon was the potential shooter. Serio then went to the hospital and conducted a gun-residue test on Foster, which was negative. The next morning, Serio arrested and charged Weatherspoon. At this time, Weatherspoon gave a voluntary statement in which she stated that, during the altercation, Foster had pulled a gun and fired it. She said she had shot her gun while fleeing to safety.

5

¶12.   Importantly, according to Serio's testimony, Weatherspoon voluntarily described the gun as a revolver:

> [Prosecution]:  Could you tell us what her description of the gun was?
>
> [Serio]:  She stated she didn't know what kind of gun it was.  So I said okay, was it a revolver or an automatic and she still kind of didn't know.  So I pulled my weapon and said, "Okay, this is an automatic.  It has a clip and when you fire it, the bullets pop out the top.  Was it like that?"  She said, "No."  She described it as being – having rounds cylinder, which is just the standard revolver that you open up and you put the bullets in one at a time, which indicates that it was a revolver and not an automatic weapon.

The police never recovered the murder weapon, though Weatherspoon stated to the police that she had dropped it in the club's parking lot.

¶13.   During Serio's investigation, Serio received information from Lady Branch, who was at the club during the shooting.  Branch informed Serio that Henry Taylor also had been shooting his weapon at the club on the night of McKinney's death.[3]  Several months after the shooting, the police found Taylor and tested his .22 pistol, eventually ruling out this .22 as the murder weapon. Branch did not testify at trial.

¶14.   Serio testified that he recalled a .380 weapon had been found at the crime scene and admitted that a 9 mm shell casing could have been found. He added that in "the parking lot of a club . . . you can find just about anything."

¶15.   Stig Peterson, an investigator with the Cleveland Police Department, also visited the crime scene and found a .380 casing.  Another officer found more shell casings, but Peterson

---

[3] Branch's statement was not received into evidence.

6

did not know their caliber. A month after the shooting, Weatherspoon and Johnson approached Peterson at the police station and told him that Weatherspoon had found a box of .25 caliber shells at her house and wanted to provide them to the police. Weatherspoon informed Peterson that this caliber shell had been loaded into the gun she had used at the club. She had bought this .25 caliber pistol from a man from Memphis. Weatherspoon earlier had told Serio that she had shot a .22, describing the pistol as a revolver, but sought to prove that she had shot a .25 pistol. Other testimony at trial indicated that there are likely no .25 revolvers – as opposed to .25 automatics – in existence.

¶16. David Whitehead, a trace-evidence technician with the Mississippi Crime Laboratory, testified that the gun-residue kit performed on Foster was negative, consistent with Foster's story that he had not fired a gun, contrary to Weatherspoon's statements to police and her self-defense theory.

¶17. Byron McIntire, a forensic scientist specializing in firearm and toolmark identification with the Mississippi Crime Laboratory, testified that the projectile removed from McKinney's body was consistent with a .22 caliber bullet. McIntire established that Taylor's gun had not fired this bullet.

¶18. Dr. Steven T. Hayne, a pathologist, conducted the post-mortem examination on McKinney. He removed the projectile, which was consistent with a .22 caliber bullet, from McKinney's body. He also observed two gunshot wounds on McKinney. He could not determine whether a single gun inflicted these two wounds, but testified that only one wound was fatal. This fatal wound was "located over the mid-chest wall slightly to the right of the

7

mid-line . . . . " According to Dr. Hayne, the cause of death was the gunshot wound to the chest area, and the manner of death was homicide.

## DISCUSSION

¶19.    Weatherspoon raises one argument on appeal:  Whether the trial court abused its discretion when it failed to grant her motion for a new trial because the verdict of guilty as to murder was against the overwhelming weight of the evidence.  Notably, Weatherspoon does not contest the legal sufficiency of the evidence.

¶20.    In *Bush v. State*, this Court succinctly stated the standards by which this Court determines whether to grant a new trial in this context: "reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."  *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)).  The motion for a new trial is addressed to the discretion of the trial court, and such motion should be considered with caution.  "[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000)).  This Court should weigh the evidence in the light most favorable to the verdict. *Id.* (citing *Herring*, 691 So. 2d at 957).

¶21.    Weatherspoon argues that her murder conviction is based on "extremely weak and tenuous evidence" in light of the totality of the circumstances.  In other words, she contends

8

that the overwhelming weight of the evidence fails to show that Weatherspoon deliberately murdered McKinney as defined in Mississippi Code Section 97-3-19 (Rev. 2006).[4]

¶22. In support of this theory, Weatherspoon first argues that it is very possible that another person shot a gun at the Hurricane Club on the night in question. She specifically contends that anyone at the club could have had a gun that night and could have shot McKinney. Weatherspoon told Serio that Foster had pulled a 9 mm weapon. Moreover, the police received a report that Henry Taylor had fired his weapon that evening in the direction of the fight between White and Johnson. And Weatherspoon opined that, while forensic tests later determined that Taylor's .22 pistol was not the murder weapon, Taylor may have had another weapon when firing rounds at the club.

¶23. Weatherspoon also adds that, after she began to fire shots, the witnesses ducked and did not see her shoot McKinney. Therefore, "none of the witnesses [was] in a position to see when McKinney was actually shot."

¶24. Finally, assessing all of this evidence, Weatherspoon points out that, because the investigating officers found "several caliber shell casings outside of the club," "the murder

---

[4]     (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases: (a) When done with deliberate design to effect the death of the person killed, or of any human being . . . .

Miss. Code Ann. § 97-3-19 (Rev. 2006).

weapon was never recovered," and "there were no eyewitnesses to the shooting,"enough reasonable doubt existed that no reasonable jury should have convicted Weatherspoon.

¶25. On the other hand, the State argues that "the evidence, viewed in its entirety, was clearly sufficient for a reasonable, fair-minded, hypothetical juror to find beyond a reasonable doubt that Weatherspoon" shot McKinney. Moreover, the State argues that the overwhelming weight of the evidence supports the verdict.[5]

¶26. In support of these contentions, the State argues that Weatherspoon's three exclamations during the incident, McKinney's exclamation that implicated Weatherspoon, and eyewitness testimony support the verdict. First, several witnesses testified that Weatherspoon had made remarks indicative of her intent to involve herself in the fight. Foster testified that he had heard Weatherspoon state, "You running that way, you need to watch me!" Patton heard Weatherspoon exclaim, "If ya'll gone mess with my man, you're going to mess with me!" Brown heard Weatherspoon state, "Why ya'll paying attention to him? You need to be paying attention to me!" Nicks heard McKinney state, "She shot me!" Second, White, Patton, Brown, and Nicks testified that Weatherspoon was the sole shooter.

¶27. While this Court agrees that there is a *possibility* that someone other than Weatherspoon may have shot McKinney, we "cannot view the evidence in the light most favorable to the verdict and say that an unconscionable injustice resulted from this jury's .

---

[5] Because Weatherspoon's statement of the issues and analysis in her brief focus on the argument that the verdict was against the overwhelming weight of the evidence, this Court does not address the State's rebuttal argument regarding the sufficiency of the evidence.

. . verdict." ***Bush***, 895 So. 2d at 844-45. Simply stated, ample evidence exists to show that Weatherspoon deliberately murdered McKinney. *See **Russell v. State***, 497 So. 2d 75 (Miss. 1986) (citations omitted) (malice may be inferred or implied from the unlawful and deliberate use of a deadly weapon).

¶28.    The State correctly asserts that the testimony identifying Weatherspoon as the shooter and her statements support the verdict. But further evidence underscores the jury's verdict in this case, that is, the forensic evidence and the questionable nature of the evidence regarding other potential shooters.

### 1. Forensic Evidence

¶29.    Weatherspoon points out that a .380 casing and 9 mm casing were found in the club's parking lot, that no bullet was recovered from Foster's body,[6] and that investigators failed to uncover a murder weapon.

¶30.    Forensic evidence proved that a .22 caliber bullet killed McKinney, and the record provides that investigators found no .22 casings in the club's parking lot. Weatherspoon informed investigators that she had been shooting a .22 caliber weapon and had dropped the gun in the club's parking lot.  Yet, officers recovered no .22 pistol or any .22 shell casings in the parking lot.  Weatherspoon described the murder weapon as being a revolver to Serio

---

[6] The bullet is still lodged in Foster's body.

but later attempted to change her story, indicating that she had shot a .25 caliber weapon. The record indicates, however, that there are likely no .25 revolvers in existence.[7]

¶31. This evidence, viewed in its entirety, tends to show that Weatherspoon shot McKinney with a .22 revolver and explains why no .22 caliber shell casings were found. Her theory that she shot a .25 caliber weapon, after all, does not comport with the absence of .25 shell casings at the club. The record reflects there are likely no .25 revolvers, and an automatic weapon would have ejected shell casings.

¶32. Moreover, the fact that officers found a .380 casing and a 9 mm[8] casing *in the parking lot of a night club* is of minimal probative value without more. As Peterson testified, "you can find just about anything" in a club's parking lot. More specifically, without some evidence tying these shell casings to some other shooter and ultimately to McKinney's death, this Court cannot say that the .380 and 9 mm shell casings are so probative as to contravene the other evidence supporting the verdict.

*2. Other Potential Shooters*

¶33. Lady Branch did not testify at trial, but the record indicates that Branch had contacted Serio about another potential shooter. This Court finds that Serio's testimony before the jury

---

[7] The defense did not challenge the alleged nonexistence of .25 revolvers.

[8] Both Serio and Peterson testified that a 9 mm casing might have been found, but neither recalled specifically. Officer Jones collected this evidence at the crime scene, but he did not testify regarding the shell casings he found. In any event, while a 9 mm casing might have been found, and while Foster had a 9 mm weapon in his car, the bullet that fatally wounded McKinney was fired from a .22 caliber weapon.

12

concerning another potential shooter, Henry Taylor,[9] was not compelling enough to render the jury's verdict unconscionable. In fact, on cross-examination by defense counsel concerning the result of his investigation, Serio testified that "[w]e have no indication that anyone else was shooting other than [Weatherspoon]. And, again, we resolved that matter concerning that gun." Likewise Serio testified that Henry Taylor's .22 pistol, recovered months after the shooting, was determined not to be the murder weapon.

¶34. Furthermore, in Branch's interview with Serio,[10] Branch stated that others had fired shots that night:

> [George Serio]: All right tell me what happened down there[.] [A]bout 2:00 you were there [and] saw [the] fight take place?
>
> [Lady Branch]: Yes when I drove up . . . I went across the street and I seen Derrick and I called him across the street and he was standing up there talking to me.
>
> [George Serio]: Derrick McKinney.
>
> [Lady Branch]: Derrick McKinney . . . we was just passing words . . . and across the street I seen Primo and Jennifer and her boyfriend . . . arguing . . . Rail broke off went running said I'm fixing to go break the fight up and I said don't go across the street. When he ran across the street I seen Jennifer with the gun in her hand and she was just shooting and **when she started shooting he grabbed his chest so I ran down beside the car** and Henry Miller he was

---

[9] There is some confusion in the record regarding Henry Miller and Henry Taylor. Lady Branch told police that Miller had shot a weapon and Taylor did not. However, investigators checked only Taylor's gun. Serio testified that someone had identified Taylor as the shooter. Neither Miller nor Taylor testified at trial.

[10] Defense counsel did not move to have Branch's statement entered into evidence. This statement was marked Defense Exhibit D-3 for identification purposes. However, solely for the sake of completely understanding this case, we have included pertinent excerpts.

shooting across from the car and I was trying to tell him to stop shooting and so when I got up I seen Henry with a gun he was shoot[ing] and I seen Main Taylor with a gun I didn't see him shooting . . . .

. . . .

[George Serio]: So Jennifer pulls her gun out and starts shooting then everybody runs.

[Lady Branch]: And people started shooting back.

[George Serio]: All right.

[Lady Branch]: Cause I heard I know Henry shooting it was 3 different guns going off.
[George Serio]: Was Main Taylor shooting.

[Lady Branch]: I don't I seen him with a gun but I don't know was he shooting when it was over with I don't know was he shooting or not.

[George Serio]: So if Henry Miller was shooting he would have been shooting to help.

. . . .

[Lady Branch]: Uh-uh uh-huh he was shooting this way cause the car was right here they was on this side and he shooting over the car.

[George Serio]: So everybody's thinking Jennifer shot Derrick and Bacardi but it could have been Henry Miller.

[Lady Branch]: I know she shot Derrick he ran right like right into it across the street.

(Emphasis added). Lady Branch's statement to Serio reveals that there may have been more than one shooter; however, she also informed Serio that "she [Weatherspoon] shot Derrick" because he ran directly into the line of fire. In any event, Serio's investigation ruled out other shooters.

14

¶35. Finally, although Weatherspoon stated to police that Foster had pulled a gun and shot it during the fight, the gun-residue test performed on Foster was negative. At trial, Foster admitted that after he was wounded, he had drawn his 9 mm weapon and then collapsed. Henry Taylor's .22 pistol was not tested until months after the shooting occurred. This .22 pistol could have been a different pistol. Officers did find other shell casings at the club, and the murder weapon was not recovered. Also, no one specifically saw Weatherspoon shoot McKinney. However, several eyewitness testified that Weatherspoon had shot her weapon toward the fight. Other eyewitnesses testified that McKinney had run toward the fight, and after Weatherspoon had fired her weapon, McKinney had run away from the fight and, before his death, stated "She shot me." Several witnesses at trial also testified that Weatherspoon had made comments before the shooting indicating her intent to harm those fighting her boyfriend. And several witnesses testified that she was the sole shooter and that they had seen no one else with a gun.

¶36. Moreover, Dr. Hayne removed a .22 caliber bullet from McKinney, and Weatherspoon told investigators that she had shot a .22 pistol. Also, the record is not inconsistent with the State's theory that Weatherspoon shot a revolver. She described the weapon as being a revolver. Officers found no .22 or .25 shell casings. The testimony at trial estimated the shots to be anywhere from three to seven in number; much of the testimony revealed that there were no more than six shots, which is consistent with the bullet capacity of a revolver. Finally, witnesses testified that the shots sounded as if they had come from the same direction.

15

¶37. In sum, we are duty-bound to follow our well-established standard of review when a jury verdict is assailed via a motion for a new trial, alleging that the verdict is contrary to the weight of the evidence. *See* URCCC 10.05(2). This Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." **Bush v. State**, 895 So. 2d at 844 (citing **Herring**, 691 So. 2d at 957). Stated differently, we are unable to conclude from the record before us that we are sanctioning an unconscionable injustice by allowing the jury's verdict to stand finding Jennifer Weatherspoon guilty of the murder of Derrick McKinney.

## CONCLUSION

¶38. For the reasons stated, the final judgment of conviction entered by the Circuit Court for the Second Judicial District of Bolivar County, consistent with the jury verdict finding Jennifer Weatherspoon guilty of the murder of Derrick McKinney, and the subsequently imposed sentence of life imprisonment in the custody of the Mississippi Department of Corrections, is affirmed. For the sake of clarity, since Jennifer Weatherspoon, on appeal, did not attack her aggravated-assault conviction and twenty-year sentence, this conviction and sentence are likewise affirmed.

¶39. **COUNT I: CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCE IMPOSED IN COUNT I SHALL BE SERVED CONSECUTIVELY TO THE SENTENCE IMPOSED IN COUNT II.**

**WALLER, C.J., GRAVES, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**